UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT HOFFMAN,

    Plaintiff,

v.

JOAN ALFREY, *et al.*,

    Defendants.
_____/

Case No. 1:15-cv-1194

Hon. Paul L. Maloney

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. This matter is now before the Court on motions for summary judgment filed by defendant Dr. Gail Burke (ECF No. 94) and defendant Registered Nurses (RNs) Joan Alfrey, James Leland, and Luke Rexford (ECF No. 97).

    **I.**    **Plaintiff's complaint**

Plaintiff filed an 85-paragraph complaint setting forth incidents which occurred over a three-day period in February 2015. Defendants Alfrey, Leland and Rexford (collectively the "MDOC Defendants") have fairly summarized plaintiff's claims against them as follows:

> At the time giving rise to the allegations in his Complaint, Hoffman was incarcerated at the Bellamy Creek Correctional Facility (IBC), Ionia, Michigan.
>
> In particular, Hoffman alleges that on the evening of February 5, 2015, he became ill, experiencing extreme abdominal pain and vomiting. (ECF No. 1, PageID.4 at ¶¶15-16). After being escorted by unit staff to Healthcare, RN Joan Alfrey told Hoffman he would have to wait until they were done doing Intake cases. (ECF No. 1, PageID.4 at ¶¶21-22).

1

> At approximately 7:55 pm, Hoffman was called back to the triage area where he encountered RNs Alfrey, Luke Rexford and James Leland. Hoffman alleges that RN Alfrey directed him to get onto the examination table, despite his complaints of severe epigastric pain, severe vomiting, abdominal spasms, rapid breath and profuse sweating. (ECF No. 1, PageID.5 at ¶¶27-31).
>
> Despite "withering in pain" and requesting to be sent to the hospital, RN Rexford stated that he couldn't call anyone and that Hoffman would "be ok for the night". (ECF No. 1, PageID.6 at ¶¶34-36). When Hoffman told RN Alfrey that it was either his gallbladder or pancreas, she stated he was "faking". RNs Alfrey and Rexford then left the area. (ECF No. 1, PageID.6-7 at ¶¶40-42).
>
> When they returned, Hoffman suggested that RN Alfrey touch his abdomen area so that she could see how rigid his stomach muscles were, but she refused. RN Alfrey did take Hoffman's blood pressure, which registered 180/88. All the nurses then left to confer in the hallway. (ECF No. 1, PageID.7 at ¶¶44-48). When they returned, Hoffman was instructed to go back to his housing unit and quit faking. (ECF No. 1, PageID.7 at ¶50).
>
> On the following day, February 6, 2015, Hoffman was seen by Dr. Burke. (ECF No. 1, PageID.8 at ¶53). Dr. Burke examined Hoffman, gave him a prescription and ordered blood tests. (ECF No. 1, PageID.8 at ¶¶54-56).
>
> Hoffman returned to Healthcare later that afternoon complaining to RNs Alfrey and Leland that he got dizzy and hit his head on his locker. RN Alfrey told him to quit faking and then looked into his eyes with a flashlight. Hoffman then began to complain that his pain medication was ineffective and not helping at all. RN Alfrey then told Hoffman that he wasn't getting more pain medication, go back to his cell, drink plenty of water and laydown. (ECF No. 1, PageID.10-11 at ¶¶69-72).
>
> On February 7, 2015, RN Rose informed Hoffman that he had pancreatitis and that he was being transferred to Ionia Sparrow Hospital and eventually transferred to McLaren Lansing Hospital for treatment. Hoffman claims that the delay in treatment caused him to needlessly suffer pain. (ECF No. 1, PageID.12 at ¶¶78-80).

MDOC Defendants' Brief (ECF No. 98, PageID.1421-1422).

> Dr. Burke fairly summarized plaintiff's claims against her as follows:
>
> Plaintiff claims that he experienced intense abdominal pain on February 4, 2015, and was seen by a nurse, who examined him and instructed him to return if his symptoms persisted. [PageID.3-4] He alleges that he continued to experience abdominal pain on February 5, 2015, and was taken to the health care unit but not provided adequate care by the nursing staff. [*Id.* at PageID.4] Plaintiff alleges that

2

> Dr. Burke saw him on February 6, 2015, but she ignored his complaints of severe abdominal pain, vomiting, and dizziness. [*Id.* at PageID.9] Specifically, he claims that Dr. Burke only performed a "passive examination," ordered blood tests, and prescribed Ultram but failed to take vital signs or send Plaintiff to the hospital. [*Id.* at PageID.8-9] Plaintiff alleges that Dr. Burke ignored a urine test positive for protein and nitrites which showed signs of an organ injury and infection. [*Id.* at PageID.10] Plaintiff claims that, later that day, he fell and hit his head and sustained a small laceration. [*Id.* at PageID.10-11] He alleges that Dr. Burke was informed he hit his head but failed to come and check on him. [*Id.* at PageID.11] He alleges that the next day, February 7, 2015, he was summoned to the health care unit, informed him that he had pancreatitis, and transported to a hospital. [*Id.* at PageID.12] Plaintiff claims that he remained at the hospital for 24 days and has had to undergo multiple surgeries for his pancreas condition. [*Id.*]

Dr. Burke's Brief (ECF No. 94, PageID.502-503) (boldface omitted) (brackets in original).

Based on these facts, plaintiff provided a list of the alleged acts of deliberate indifference as follows (in his words):

> At all times relevant hereto, Defendants Alfrey, Rexford, Leland and Burke acted with deliberate indifference to Hoffmans serious medical needs by; (1) Failing to provide prompt emergency care;, (2) Failing to pen accurate medical records reflecting Hoffmans complaints;, (3) By failing to make reasonable inference that Hoffman was suffering from severely painful medical condition from Hoffmans complaints and medical records;, (4) Performing exams that were so cursory they amounted to no exams at all; , ( 5) Also displaying dismissive attitudes to Hoffmans complaints which led to a delay in actual treatment;, (6) And Burke failing to respond to Hoffman when he fell and she was informed; , all of these were done in the face of Hoffmans symptoms of severe pain and other symptoms, vomiting, inability to sleep, walk normally, talk and breath, that even a lay person would recognize of needing emergency medical care, Hoffman suffered physical injury which required a prolonged hospital stay of 24 days and so far 4 surgeries.

Compl. (ECF No. 1, PageID.13). For his relief, plaintiff asks for compensatory damages in excess of $150,000.00, punitive damages, and exemplary damages. *Id.* at PageID.14.

### III.   Motions for summary judgment

#### A.   Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

3

Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.     Eighth Amendment claims

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (l976).  Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation.  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  In other words, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.  When a prisoner received treatment for his condition, the prisoner must show that his treatment was "so woefully inadequate as to amount to no treatment at all."  *See Mitchell v. Hininger*, 553 Fed. Appx. 602, 604-05 (6th Cir. 2014), quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotation marks omitted).

A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer*, 511 U.S. at 834.  A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  The objective component requires the infliction of serious

pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

1. **Plaintiff's affidavit**

Plaintiff filed over 90 pages of exhibits in opposition to the motion for summary judgment which included: medical records; a 42-paragraph affidavit setting forth his version of events with respect to the MDOC defendants; a 41-paragraph affidavit setting forth his version of facts with respect to Dr. Burke; and affidavits from other prisoners. *See* Attachments (ECF Nos. 105-1 through 105-7) and (ECF Nos. 110-1 through 110-3). For purposes of this motion, the Court will accept plaintiff's versions of the facts which are relevant to this action, i.e., facts which involve defendants and relate to the events of February 5th, 6th and 7th, 2015.

Some of the facts upon which plaintiff relies to establish deliberate indifference are as follows. When plaintiff saw the MDOC defendants at about 8:00 p.m. on February 5, 2015, he advised them of his history of gallbladder problems, that he had pain of level 10 on a scale of 1 to 10, and that he had rigid abdominal muscles, profuse sweating, labored breathing, severe pain, and

6

vomiting. Hoffman Aff. (ECF No. 105-3, PageID.1552). "At no time on February 5, 2015 did any IBC health care staff obtain a urine sample from me, nor did they perform a [sic] auscultation on me, or listen to my bowel sounds." *Id*. Plaintiff also stated that defendants accused him of faking, *e.g.*, "On February 5, 2015 and again on February 6, 2015 Alfrey accused me of faking my illness because I told her I had read about it in the Merck Manual." *Id*. at PageID.1553. Plaintiff attributes the incidents on February 6, 2015, as involving RN Alfrey rather than RN Leland. *Id*.

With respect to Dr. Burke, plaintiff stated that he observed the doctor and a non-party nurse "take my brown urine and dip a test strip into it," and that the doctor told his that "your urine is positive for protein and nitrites." Hoffman Aff. (ECF No. 110-1, PageID.1602). After hearing this, plaintiff stated, "I told you I was sick, please send me to the hospital." *Id*. To this, Dr. Burke responded, "You'll be ok til I see you on the 10th". *Id*. When plaintiff protested and stated "I know that could mean an injury to an organ and a [sic] infection," the doctor replied "'I'm the doctor here' and 'I know what they mean' and 'I'll make the decisions how to treat you.'" *Id*.

### 2.    Dr. Burke's affidavit and plaintiff's medical records

Plaintiff's 882-page medical record is filed under seal. *See* Medical Record (ECF No. 96-1). In her first affidavit, Dr. Burke summarized plaintiff's relevant medical history and treatment during the three days at issue. The doctor's affidavit is supported by citations to the medical record. Dr. Burke set forth the following facts relevant to this case. Plaintiff had a history of gallbladder abnormalities, being diagnosed with cholecystitis (inflammation of the gallbladder) in March 2013, and was taken to the emergency room. Dr. Burke Aff. (ECF No. 94-2, PageID.519-520). Upon his return to the correctional facility, plaintiff refused an ultrasound and further treatment for his cholecystitis. *Id*. at PageID.520. Plaintiff later stated that he refused a subsequent MRI because he was "tired of surgeries." *Id*. Dr. Burke noted that plaintiff's medical record

reflected intermittent complaints for abdominal pain between March 2013 and February 2015, which were addressed by medical staff. Burke Aff. at PageID.520.[1]

On February 5, 2015, plaintiff submitted a health care request complaining of abdominal pain and noting a history of pancreas issues. *Id*. Non-party Nurse Kelly Stevens saw plaintiff later that day, and noted that plaintiff could walk, sit, and lay down on the examination table without difficulty. *Id*. Upon examination, Nurse Stevens found no distention or rebound in the abdomen. *Id*. She scheduled plaintiff for an appointment with a medical provider for further evaluation and advised him to report any further symptoms immediately. *Id*. at PageID.521. Later than evening, plaintiff was examined by RNs Rexford and Alfrey. *Id*. RN Alfrey evaluated plaintiff and found that he was in mild distress. *Id*. A urine dipstick was negative. *Id*. RN Rexford noted that plaintiff's vital signs were within normal limits, and reported tenderness and pain upon palpation in his abdomen. *Id*. RN Rexford instructed plaintiff to take Motrin, and RN Alfrey scheduled plaintiff for an examination in the morning. *Id*.

Early the next morning (3:17 a.m. on February 6th), plaintiff spoke with non-party Nurse Tony McCaul regarding his left upper abdominal pain. *Id*. at PageID.521. The nurse advised plaintiff that he was scheduled for an appointment with a physician later that morning. *Id*.

Dr. Burke saw plaintiff at about 9:43 a.m. *Id*. This was Dr. Burke's first encounter with plaintiff. *Id*. At that time, plaintiff was not in acute distress and did not ask to be sent to the emergency department. *Id*. Plaintiff reported that he was experiencing similar abdominal pain to that which he experienced two years ago when he had a CT scan to rule out gallstones. *Id*. Plaintiff

---

[1] The Court notes that plaintiff provided an explanation for his refusal to accept treatment. In his second affidavit, plaintiff admitted that "[f]or approximately two months following my March 8, 2013 diagnosis of Cholecystitis I made a personal medically-based decision to refuse further treatment for the diagnosis," but stated that "Beginning on May 28, 2013 and for the next two years, I made repeated requests to MDOC/Corizon health care staff to resume treatment for my Cholecystitis condition." Hoffman Aff. (ECF No. 110-1, PageID.1600). While plaintiff downplayed his actions, it is undisputed that he had a history of refusing medical treatment for abdominal problems.

denied nausea, vomiting, constipation, diarrhea, blood in stool, or any other gastrointestinal symptoms.  *Id*. at PageID.521-522.  The doctor performed an abdominal examination which did not reveal signs of an acute abdomen in need of urgent or emergent evaluation.  *Id.* at PageID.522. Dr. Burke ordered relevant screening labs, which included "amylase and lipase tests, which test for, among other things, pancreatitis, cholelithiasis, cholecystitis, peptic ulcer disease, and liver and colon abnormalities."  *Id*.  The doctor also prescribed Ultram, which she described as "an analgesic narcotic-like medication for moderate to severe pain," and scheduled plaintiff for a follow-up appointment in four days.  *Id*.

The medical records reflect that later that day, defendant RN Leland saw plaintiff after he reportedly fell into a locker and then fell backwards onto the floor.  *Id*. at PageID.523.  At that time, "[plaintiff] was inconsistent regarding whether or not he lost consciousness."  *Id*. at PageID.524. While being examined for the reported fall, plaintiff said that he needed to go to the hospital for abdominal pain.  *Id*. at PageID.523-524.  He also requested additional pain medications.  *Id*. at PageID.524.  Plaintiff's vital signs were slightly elevated, and RN Leland told him to rest, drink water, and eat.  *Id*.  Plaintiff was unwilling to leave the clinic, but eventually did leave when two corrections officers were present.  *Id*.

On February 7, 2015, the lab contacted IBC health staff to report that plaintiff's test results showed elevated pancreatic enzyme levels.  *Id*.  When Dr. Burke received the results, she ordered plaintiff to be transferred immediately to the emergency room for further treatment.  *Id*. Plaintiff was admitted to the hospital when two days later (February 9, 2015), he underwent a CT scan which showed necrotizing pancreatitis.  *Id*.  *See* Medical Records (ECF No. 96-1, PageID.1311-1312).  Plaintiff was treated for necrotizing pancreatitis and discharged from the

9

hospital on March 3, 2015. Burke Aff. at PageID.524. *See* Medical Records at PageID.1158, 1164-1165, 1382-1385.

In her reply brief, Dr. Burke included an additional affidavit which restated some matters and addressed an apparent new claim, i.e., that the doctor should have sent plaintiff to the emergency room on February 6, 2015, because he had a previous diagnosis of cholecystitis. Second Burke Aff. (ECF No. 112-1, PageID.1624-1625). In response to this claim, the doctor noted that cholecystitis refers to inflammation of the gallbladder, that the treatment for this condition depends upon its severity, and that plaintiff did not exhibit signs of severe cholecystitis during the doctor's February 6, 2015 examination. *Id*. In the exercise of her medical judgment, the doctor determined that plaintiff did not have an emergent condition, but in order to assess the cause of plaintiff's complaints, she ordered screening labs which tested for, among other things, pancreatitis and cholecystitis. *Id*. at PageID.1625. The lab results were received 26 hours later, showing elevated pancreatic enzyme levels. *Id*. Upon reviewing the results, the doctor ordered that plaintiff be transported by ambulance to the hospital. *Id*. *See* Medical Record (ECF No. 96-1, PageID.1190) (stating that Dr. Burke called healthcare with an order to send plaintiff to the local emergency room via ambulance for further treatment at approximately 11:23 a.m. on February 7, 2015).

### 3. Affidavits of RNs Alfrey, Rexford, and Leland

The gist of plaintiff's claim is that these three nurses were deliberately indifferent to his serious medical needs because they thought plaintiff was faking and gave him only cursory examinations. These defendants seek summary judgment based upon their affidavits. RN Alfrey stated: that she examined plaintiff on February 5, 2015; that her initial examination was negative; that she listened for bowel sounds which were present; that plaintiff did not voice increased discomfort when she palpated his quadrants; that a urinalysis was completed and normal; and that

she turned plaintiff over to defendant Rexford, the lead RN. Alfrey Aff. (ECF No. 98-2, PageID.1438). After RN Rexford's assessment, she met Rexford and Leland. *Id*. They agreed that based upon their assessments and test results, plaintiff was not in any acute distress and they established a plan of care. *Id*. Plaintiff was given instructions to see the doctor the next day and to call healthcare if his condition changed or worsened. *Id*. at PageID.1439. While Alfrey did not have a nursing encounter with plaintiff on February 6th, plaintiff was seen by a doctor that day. *Id*. Alfrey also stated that while plaintiff alleged that he had "documented gallbladder/pancreas problems in his health file" (Compl. at ¶ 33), plaintiff's medical records indicated "that he refused an ultrasound of his abdomen along with any testing for possible liver, gallbladder or pancreas disease." Alfrey Aff. at PageID.1440.

Defendant Rexford made the following statements in his affidavit: on February 5, 2015, RN Alfrey asked him to assess plaintiff, who was complaining of abdominal discomfort; that before examining plaintiff, Rexford observed plaintiff sitting upright in a wheelchair with his back to the clinic door, breathing regularly and speaking calmly with a corrections officer; that when RN Rexford introduced himself, plaintiff began to rock back and forth in the wheelchair "stared splinting at his abdomen," and "began doing the vasovagal maneuver;" that plaintiff independently got up and laid down on a bed; that upon inspection, plaintiff's abdomen was flat and not distended; that plaintiff's bowel sounds were present; that plaintiff did not flinch, grimace or pull away when he palpated plaintiff's abdomen; that he palpated plaintiff's stomach area and the palpated plaintiff's abdomen maintaining "firm pressure" for ten seconds; and, that plaintiff only expressed pain once at the 8-second mark of the last quadrant. Rexford Aff. (ECF No. 98-3, PageID.1443-1445). RN Rexford also stated that after meeting with RNs Alfrey and Leland, they

agreed that plaintiff did not have signs of an acute process going on at the moment and that it would be appropriate for plaintiff to see the medical provider in the morning. *Id*. at PageID.1445.

Defendant RN Leland made the following statements in his affidavit: on February 5, 2015, he conferred with RNs Rexford and Alfrey, and agreed with the assessment and plan of care; that on February 6th, Dr. Burke examined plaintiff and ordered lab tests; that plaintiff returned to healthcare later that day at 1549 hours, stating that he fell into his locker and then fell backwards to the floor; that plaintiff gave a contradicting history of the events, first stating that he passed out but later stating "I didn't really pass out"; that upon examination, plaintiff had ease of breathing, clear speech, steady gait and was alert and oriented; that plaintiff had a small scratch on the right frontal region of the head with no bleeding and slight puffiness in the right posterior area of the head with no open area; and that no further treatment was necessary. Leland Aff. (ECF 98-4, PageID.1449-1450). After the examination, plaintiff changed his complaint to one of abdominal pain. *Id*. at PageID.1450. RN Leland consulted with the medical provider and reported no alteration to the plan of care prescribed by Dr. Burke. *Id*. Because no lab results were back, plaintiff was instructed to return to his housing unit. *Id*.

    **4.**    **Discussion**

The issue before the Court is whether the four defendants were deliberately indifferent to plaintiff's serious medical needs in violation of his Eighth Amendment rights from February 5, 2015 through February 7, 2015. During this time frame, it is undisputed: that plaintiff presented with abdominal symptoms; that the MDOC defendants examined plaintiff on the night of February 5, 2015, and devised a treatment plan to see the doctor in the morning; that a non-party nurse saw plaintiff during the early morning hours of February 6th; that Dr. Burke examined plaintiff at or about 9:43 a.m. on February 6th; that based on this examination, Dr. Burke ordered

12

a number of lab tests and prescribed pain medication; that RN Leland saw plaintiff later that day and examined him for injuries related to a reported fall; and, that upon receipt of lab results showing that plaintiff had elevated pancreatic enzyme levels, Dr. Burke sent plaintiff to the emergency room. Even if defendants incorrectly concluded that plaintiff's symptoms were exaggerated, negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Farmer*, 511 U.S. at 835. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted).

Here, it is undisputed that Dr. Burke examined plaintiff and performed diagnostic tests to determine the source of his abdominal pain. "[T]he question whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. As discussed, plaintiff was sent to the emergency room when the lab tests indicated that he had elevated pancreatic enzyme levels. To the extent plaintiff disagrees with defendants' decision not to send him to the emergency room before February 7th, this disagreement does not form the basis for an Eighth Amendment claim. A patient's disagreement with his physician over the proper medical treatment for his condition is not cognizable as a federal constitutional claim. *Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003). For these reasons, plaintiff's claim that defendants were deliberately indifferent to his serious medical needs fails.

Plaintiff also claims that defendants violated his constitutional rights under the theory that they delayed his treatment, *i.e.*, defendants did not send plaintiff to the emergency room

when he first complained of pain in the abdomen. In reviewing a claim of delayed treatment, the Court looks to *Napier v. Madison County*, 238 F.3d 739 (6th Cir. 2001), which "held that an inmate who complains that a delay in medical treatment is 'sufficiently serious' so as to violate his constitutional rights, must present 'verifying medical evidence' to establish the detrimental effect of the delay in medical treatment." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 894 (6th Cir. 2004) (summarizing and applying the rules set forth in *Napier*). The verifying evidence requirement is used to establish the objective prong of a deliberate indifference claim. *See Burgess v. Fischer*, 735 F.3d 462, 477 (6th Cir. 2013) ("We explained in *Blackmore* that verifying medical evidence of an exacerbated injury was necessary to establish the objective prong for 'minor maladies or non-obvious complaints of a serious need for medical care'.") (citing *Blackmore*, 390 F.3d at 898 and *Napier*, 238 F.3d at 742).

Here, plaintiff attempts to present "verifying medical evidence" in the form of his affidavit, in which he stated that while at the hospital on February 11, 2015, Dr. Melissa Richardson told him that "If you had came in [sic] as soon as your abdominal pain persisted for several hours, it's a very good possibility that your pancreas may not have been digested itself, because we could have found the suspected blockage of a bilary duct and performed emergency surgery." Hoffman Aff. (ECF No. 110-1, PageID.1603). Plaintiff cites no evidence to support this hearsay statement attributed to a treating physician who is not a party to this litigation.

In the Court's opinion, plaintiff's case did not fall under the rule set forth in *Napier* because it does not involve a "minor malady" or a "non-obvious complaint" that became a serious medical condition due to a delay in treatment. Here, defendants treated plaintiff's complaints as a serious medical condition from the time he first reported pain. Assuming that the MDOC defendants believed that plaintiff was faking or exaggerating symptoms, they conferred and

concluded that his condition was sufficiently serious to schedule an appointment with a medical provider the following morning.  When Dr. Burke examined plaintiff, she did not treat his symptoms as a "minor malady" or a "non-obvious complaint."  Given plaintiff's history, the doctor recognized that plaintiff may have had a serious medical problem involving his abdomen, and ordered screening labs to test for conditions such as pancreatitis, cholelithiasis, cholecystitis, peptic ulcer disease, and liver and colon abnormalities.  When the lab tests indicated that a medical problem existed (*i.e.*, elevated pancreatic enzyme levels), Dr. Burke determined that plaintiff required emergent care and sent him to the emergency room.  Even if Dr. Burke's was negligent in delaying plaintiff's admission to the emergency room (and there is no evidence that this is the case), mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835.  In summary, plaintiff has not established that defendants were deliberately indifferent to his serious medical needs.

### C. Qualified Immunity

Finally, the MDOC defendants' brief includes a claim for qualified immunity which consists of the legal standard for qualified immunity followed by the conclusory statement, "Defendants' actions, as described in Plaintiff's complaint, did not violate clearly established law." MDOC Defendants' Brief at PageID.1432-1434.  This cursory argument is inadequately briefed and will not be considered by the Court. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

### IV.    Recommendation

For the reasons set forth above, I respectfully recommend that the motions for summary judgment filed by defendant Dr. Burke (ECF No. 94), and defendants Alfrey, Leland and Rexford (ECF No. 97) be **GRANTED**, and that this action be **TERMINATED**.

Dated:                                                                 Ray Kent
                                                                       United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).